UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUDITH LUSTIG,

        Plaintiff,

v.                                                        Case No. 03-60122
                                                          HON. MARIANNE O. BATTANI

TOWNSHIP OF WATERFORD, et al.,

        Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Before the Court is Defendants Karchinick, Johnson, and Williams' Motion for Summary Judgment (Doc. # 46) and Defendants Mondeau and Dolehanty's Motion for Summary Judgment (Doc. # 50). For the reasons set forth below, Defendants are entitled to qualified immunity on all counts and Plaintiff has otherwise failed to present sufficient evidence to resist summary judgment. Therefore, the Court **GRANTS** both motions.

**II.    STATEMENT OF FACTS**

This case arises from the arrest of Plaintiff Judith Lustig for operating a watercraft while impaired on August 25, 2002. On the day of her arrest, Lustig spent the afternoon playing golf at the Knollwood Country Club. At the club, she alleges she drank two glasses of wine. At 6:45 p.m., Lustig drove to her home on Cass Lake where she poured herself another glass of wine.

She then drove her pontoon boat, with her puppy inside, to her sister's residence on the other side of Cass Lake. Thereafter Lustig spent some time with her sister and brother-in-law, sipping wine on their patio.

At approximately 8:30 p.m., Lustig began her trip home on her boat. Before she could return home, however, she was stopped by Oakland County Sheriff's Marine Deputies Johnson and Karchnick ("the Deputies"). The Deputies testified that they stopped Lustig because her docking lights were on, thereby preventing others from seeing her red and green navigational lights, as required by state law. Lustig, in constrast, testified that their initial conversation was informal and amicable.

Lustig noticed that the conversation experienced a drastic change of tone when "[t]he black police officer said something to Bryan Johnson and Bryan Johnson asked me had I been drinking." Waterford Defs.' Ex. B, p.95.[1] Lustig replied that she had one drink with her but it was not finished yet and later revealed that she had imbibed two glasses of wine earlier. Lustig describes what happened next as follows:

> A. [Johnson] handed me my puppy and said[,] say your ABCs, don't sing them, say them now.
> Q. Did you?
> A. No. I laughed.
> Q. What happened next?
> A. I thought he was kidding.
> Q. What happened next?
> A. He asked me if I was refusing to cooperate and I still laughed. I said you're joking, right.
> Q. What happened next?
> A. I began to say my ABCs, then I refused.

---

[1] Plaintiff now acknowledges that Deputy Karchnick is Caucasian, not African-American.

> Q. Did you say them accurately?
> A. I started to and I refused. I stopped.

Waterford Defs.' Ex. B, pp. 96-97. After Lustig refused to cooperate, the officers attempted to perform a safety check of the boat. The Deputies testified that Lustig was unable to properly operate the boat's lighting system and tried in vain to turn on her navigational lights by touching a variety of controls. Feeling that Lustig was becoming belligerent, the Deputies then towed her ship to shore and radioed for assistance from the Waterford Police Department because they did not have a portable breathalyser unit or a vehicle to transport Lustig if they decided to arrest her.

On shore, several Waterford policemen were waiting. Soon thereafter, Lustig's husband Richard Lustig, arrived and began swearing at the officers. Defendants allege that Mrs. Lustig also began shouting at the officers. Lustig testified that officers Mondeau and Dolehanty ("the Waterford Officers") boarded her boat, placed her arms behind her back and escorted her off the boat. She alleges that the officers used excessive force and injured her arms in the process. She further alleges that when she complained that the officers were hurting her, Mondeau said, "Good. I love to manhandle women" and jerked her arm upwards.

Somewhere between the dock and the patrol car, the Waterford Officers released Lustig's arms and administered a Preliminary Breath Test which indicated that Lustig had a blood alcohol content of 0.15%. It is uncontested that during this period Plaintiff was yelling at the law enforcement officials and calling them "Sons of bitches." It is also uncontested that Lustig's husband began shouting at her in an attempt to get her to cooperate with the police. Lustig was then arrested and transported to the Oakland County Jail for processing. On March 14, 2003,

Plaintiff pled no contest to operating a watercraft while impaired.

Several weeks after the incident, Plaintiff began experiencing debilitating pain and a lack of feeling in her right arm and shoulder. When she went to the emergency room, she did not mention arrest or otherwise attribute her injury to Mondeau's actions. She was told that the pain and lack of feeling was caused by an abnormal cervical rib that was putting pressure on the subclavian artery and cutting off circulation to her right upper extremity. Plaintiff's treating physician, Dr. Vidya Vakhariya, was unable to ascertain whether Plaintiff's condition was caused by forced used in her arrest or a congenital condition. Plaintiff initiated this civil action on June 10, 2003. The claims remaining in this lawsuit are: excessive force in violation of her Fourth Amendment rights (Count I), unreasonable seizure in violation of her Fourth Amendment rights (Count II), failure to prevent the use of excessive force in violation of the Fourth Amendment (Count III), retaliation and deprivation of property in violation of the First, Fifth and Fourteenth Amendments (Count IV), assault and battery (Count VII), intentional infliction of emotional distress (Count VIII). See Amend. Compl.

### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) authorizes the Court to grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." There is no genuine issue of material fact if there is no factual dispute that could affect the legal outcome on the issue. Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  In other words, the movant must show he would prevail on the issue even if all factual disputes are conceded to the non-movant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.   DISCUSSION

### A.   Qualified Immunity

The Oakland Deputies contend that the initial stop and detention of the watercraft was constitutional as they had probable cause to stop Lustig because her docking lights were obscuring her navigational lights.  Defendants submit that they did not commit a constitutional violation in permitting the Waterford Officers to arrest Plaintiff because excessive force was not used in effectuating the arrest.  The Waterford Officers also contend that the use of force was reasonable under the circumstances.

In response, Lustig argues that the "probable cause [for her initial stop and detention] was fabricated or on immediate inspection did not exist."  Pl.'s Resp. Br. at 15.  Although Lustig makes blanket statements that she has stated a cognizable claim that the initial stop and detention were unreasonable, and that excessive force was used in her arrest, she makes no attempt to present her analysis in the traditional qualified immunity framework.

Qualified immunity is an affirmative defense that shields government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "The entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute

immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The United States Supreme Court has set forth a two-prong test to determine whether an officer-defendant is entitled to qualified immunity. Saucier v. Katz, 533 U.S. 194, 200 (2001). The first prong requires the reviewing court to inquire whether the facts, viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right." Id. at 201. The court must "concentrate at the outset on the definition of the constitutional right and [then] determine whether on the facts alleged, a constitutional violation could be found." Id. 207. If a constitutional violation could be found, the second prong requires the court to decide whether a reasonable official would, at the time the act was committed, understand that his conduct violated that right. Id. at 201. A government official will be entitled to immunity as long as the conduct does not amount to a violation of a clearly established right of which a reasonable person would have known. Harlow, 457 U.S. at 818. A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted." Saucier, 533 U.S. at 202. Qualified immunity protects police officers whose actions fall within the "hazy border between excessive and acceptable force." Id. at 206.

    1.  Defendants Karchnick, Johnson, and Williams ("the Oakland Deputies") are entitled to qualified immunity.

Plaintiff alleges that the initial stop and inspection of her boat amounted to an unreasonable search and seizure in violation of her Fourth Amendment rights. A "police officer is permitted to make an arrest if there is probable cause to believe that the arrestee has committed or is committing and offense." Sandul v. Larion, 119 F.3d 1250, 1256 (6th Cir.

-6-

1997). Here, the record evidence indicates that Defendants Karchnick and Johnson had probable cause to stop Plaintiff's watercraft because they were unable to see her navigational lights. It is undisputed that driving a watercraft without visible navigation lights amounts to a violation of Michigan law. MAC 281.1241 states, in pertinent part:

> An outboard motorboat 16 feet or over and less than 26 feet in length shall be equipped as follows:
> ...
> (e) If under way between sunset and sunrise, the motorboat shall be equipped with...a combination 20 point bow light forward, showing green to starboard and red to port visible 1 mile or in lieu of this requirement may display lights as specified by the international rules of the road.

Defendants' incident report and testimony confirms that the deputies made the initial stop and safety inspection because Plaintiffs' navigational lights were not visible. Notably, Plaintiff did not challenge the Deputies' report during her criminal proceedings.

The record evidence also demonstrates that after the initial stop, Defendants had probable cause to interview Plaintiff and to take her into custody. Confronted with: (1) the presence of alcohol on the boat, (2) Plaintiff's inability to recite the alphabet completely, and (3) Plaintiff's refusal to cooperate with the inspection, the Deputies had "reasonably trustworthy information [that was] sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense." Diamond v. Howd, 288 F.3d 932, 936-37 (6th Cir. 2002) (quotation omitted).

It is also evident that the Oakland County Defendants are entitled to qualified immunity regarding Plaintiff's claim that they failed to prevent Defendant Mondeau from using excessive force, i.e., raising her arms too high while they were pinned behind her back. Under Plaintiff's

version of what happened that night, the Oakland Deputies neither participated in escorting her from the boat nor encouraged the alleged use of excessive force. In Plaintiff's own words, "[t]he Oakland County deputies were not urging any need for speed." Pl.'s Post Hear'g Br. at 2. Thus, there was no practical way in which the Oakland Deputies could have anticipated, encouraged, or prevented Mondeau's sudden jerking of her arm upwards. Consequently, all of the claims against the Oakland Deputies must be dismissed as a matter of law.

> 2. <u>Defendants Mondeau and Dolehanty's ("the Waterford Officers") are entitled to qualified immunity</u>.
>
> *(a)   Plaintiff has failed to identify a potential violation of a constitutional right.*

Under the first prong of the qualified immunity analysis, Plaintiff's testimony fails to establish a potential violation of a constitutional right with respect to either her arrest or the manner in which she was escorted to the patrol car. First, it should be beyond question that the Waterford Officers had probable cause to take Plaintiff into custody. The Sixth Circuit recently articulated the governing standard of the transfer of knowledge and information between officers:

> The legality of a seizure based solely on statements issued by fellow officers who issued the statements possessed the requisite basis to seize the suspect. Moreover, an officer can lawfully act solely on the basis of statements issued by fellow officers if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of the requisite basis.

<u>Meadows v. Thomas,</u> No. 03-5609, slip copy, 2004 WL 2633608 (6th Cir. Nov. 18, 2004) (quoting Rogers v. Powell, 120 F.3d 446 (3rd Cir. 1997)). Here, Defendants Mondeau and Dolehanty had received information from the Oakland Deputies that Plaintiff had been operating

a watercraft under the influence and had been uncooperative. There was no reason to suspect that the Oakland Deputies did not possess the necessary information to support their report. On the contrary, the report was confirmed by Plaintiff's uncooperative comments and behavior. Therefore, the Court finds under the first prong of the qualified immunity analysis that no potential violation occurred in regards to Plaintiff's arrest.

Second, Plaintiff has not produced sufficient evidence that Defendants violated her constitutional rights when they restrained her arms and escorted her to the patrol car. The "right to be free from 'excessively forceful handcuffing' is a clearly established right for qualified immunity purposes." Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir. 2002) (citation omitted). When evaluating whether a police action involved excessive force, a court must pay "particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Darrah v. City of Oak Park, 255 F.3d 301, 307 (6th Cir. 2001) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)). The court must also bear in mind that the Fourth Amendment "prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general." Dickerson v. McClellan, 101 F.3d 1151, 1162 (6th Cir. 1996).

The dispositive inquiry here is whether Mondeau's application of the control hold could amount to a possible constitutional violation. Although the evidence must be construed in Plaintiff's favor, the Court must also be "mindful that 'the mere existence of *some* factual dispute' will not frustrate an otherwise proper summary judgment." Dunigan v. Noble, 390 F.3d 486, 491-92 (6th Cir. 2004) (quoting Anderson, 477 U.S. at 247-48). Accordingly, the Court

must determine "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed." Id. (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1872)).

The Court finds that even when the evidence is taken in the light most favorable to Plaintiff, Mondeau's[2] application of the control hold could not be deemed to have violated her right to be free from excessive force. There is a minor factual dispute as to how high Mondeau held Plaintiff's arm when he was escorting her to the patrol car. Plaintiff testified that she felt pain when Mondeau "jerked" her arm up.[3] However, her confused testimony as to how high Mondeau held her arm fails to create an inference that excessive force was used, especially when compared with the contrary testimony of the eye-witnesses. The clearest testimony about Mondeau's application of the control hold was provided by Plaintiff's husband, Richard Lustig. He testified that Plaintiff was being directed forward as she was *bending forward*, and that her

---

[2] It should be emphasized that Plaintiff's testimony indicates that Officer Dolehanty could not have caused her alleged injury. Dolehanty applied the control hold to Plaintiff's left hand which was uninjured. Furthermore, Plaintiff has not alleged that he jerked her arm up or otherwise applied unnecessary force. To the extent that Plaintiff claims that Dolehanty failed to prevent Mondeau from allegedly jerking her arm up, he is entitled to qualified immunity because there was no practical way he could have anticipated or prevented Mondeau's alleged misconduct.

[3] The Court notes that the evidence Plaintiff has marshaled in support of her case is inconsistent and unreliable. As Plaintiff concedes, "her memory [of the incident] is probably incorrect." Pl.'s Resp. Br. at 4. In her deposition, she misidentified several of the officers who were involved in the incident and offered inconsistent explanations of her refusal to participate in the sobriety tests. Plaintiff's hazy testimony, combined with the uncontested evidence that she either failed or refused to participate in the verbal sobriety test, registered a 0.15 on the breathalyzer test, and was yelling at the police officers, culminate in a case that no reasonable jury could believe. Anderson, 477 U.S. at 248.

arms was being lifted up away from her body at an angle of seventy-five to ninety degrees, no more than a foot way from her body. See Dep. of Richard Lustig at pp. 64, 65, 69-79, 75-78. Even assuming Mr. Lustig's testimony was accurate, there is no indication that the control hold was applied in a manner that amounted to excessive force.

That there was no potential violation of a constitutional right is also demonstrated by the lack of evidence, outside of Plaintiff's subjective complaint of pain, that she suffered an injury when Mondeau and Dolehanty escorted her from the dock. Notably, Plaintiff did not seek medical treatment at the jail or immediately after the incident. When Plaintiff did seek treatment several weeks later, she did not report that Mondeau's actions were the cause of her pain. The Court concludes that this evidence is "so one-sided" that Defendants are entitled to summary judgment as a matter of law on the issue of qualified immunity. Anderson, 477 U.S. at 251-52.

*(b)     Defendants' actions were objectively reasonable.*

Even if Plaintiff were to survive the application of the first prong of the qualified immunity analysis, Mondeau and Dolehanty are still entitled to immunity because their actions were objectively reasonable under the circumstances. A reasonable officer would have been justified in applying the control hold in the manner that Mr. Lustig depicted in light of the following circumstances: (1) the Oakland Deputies' report that Plaintiff had refused to comply with a sobriety test and had been drinking; (2) the risk posed by Plaintiff's husband who was making belligerent comments to the officers; (3) Plaintiff's own shouting at the officers; (4) Mr. Lustig's shouting at his wife to cooperate with the police; and (5) the danger posed by escorting a suspect from a watercraft. Defendants responded efficiently to a tense situation where they

were responsible for safely taking a belligerent, inebriated suspect into custody while her irate husband was shouting profanities at them. Under these circumstances, it would not be clear to a reasonable officer that the alleged application of the control hold was unlawful.

### B. State Law Claims

Defendants contend that they are immune against intentional tort claims that stem from a police action. Plaintiff fails to address this issue. The Court finds that summary judgment of the state law claims is appropriate because intentional torts are foreclosed by Michigan law in situations such as this where a police officer applies force that is reasonably necessary to effect an arrest. Young v. Barker, 158 Mich. App. 709, 723 (1987). Plaintiff's intentional tort claims are thus "completely without merit as it is well established that an arresting officer may use such force as is reasonably necessary to effect a lawful arrest." Id.

### C. Retaliation and Deprivation of Property Claims

Plaintiff states that her arrest, prosecution, and the illegal suspension of her driver's license were retaliatory and led to a deprivation of property. Plaintiff believes that, together with her husband, she engaged in "classic First Amendment activities—complaining to and about authorities about mistreatment and abuse of power directly to the authorities themselves and/or exercising the right of access to the courts and petition for redress of grievance." Defendants concede that a 625G was issued in error, but contend that Plaintiff has not stated a prima facie case of retaliation.

A prima facie case for retaliation has three elements:

    (1)    the plaintiff engaged in protected conduct;
    (2)    an adverse action was taken against the plaintiff that would deter a person

|     |     |
| --- | --- |
| (3) | of ordinary firmness from continuing to engage in that conduct; and there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. |

Thaddeus-X v. Blatter, 175 F.3d 378 (6th Cir. 1999).

The evidence indicates that the confusion surrounding the suspension of Mrs. Lustig's driving privileges was merely a clerical error. The parties agree that she was given a form that should have accompanied an arrest for driving an automobile (rather than a watercraft) under the influence. However, there is simply no evidence the incorrect form was given intentionally or resulted in any tangible harm. Plaintiff had adequate opportunity to correct the error during her plea hearing in March of 2003 but failed to do so. Moreover, she did not suffer any cognizable harm or deprivation of property because she was issued a temporary driving permit on the night of her arrest that would have allowed her to drive.

Plaintiff's retaliation claim also fails because she has not identified any protective conduct in which she engaged. Furthermore, Plaintiff has failed to allege a causal connection between any comments she made and any subsequent action by the Defendants since they are not alleged to have been involved in Mr. Lustig's attempts to remedy the clerical error. Therefore, the Court dismisses Plaintiff's retaliation and deprivation of property claims.

## V.   CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' motions for summary

judgment.  This case is hereby **DISMISSED** in its entirety.

    **IT IS SO ORDERED.**


                      s/Marianne O. Battani
                      MARIANNE O. BATTANI
                      UNITED STATES DISTRICT JUDGE


DATED: May 9, 2005

## CERTIFICATE OF SERVICE

Copies of this Opinion and Order were mailed to Keith J. Lerminiaus, Karie Holder Boylan, Hugh M. Davis on this date by ordinary mail and electronic filing.

                                                                                                s/Bernadette M. Thebolt
                                                                                                 DEPUTY CLERK